Thad M. Guyer, Esq. (Oregon # 82144), *Pro Hac Vice*
Stephani L. Ayers, Esq. (Washington # 31610), *Pro Hac Vice*
GOVERNMENT ACCOUNTABILITY PROJECT, INC., and
T.M. GUYER AND AYERS & FRIENDS, P.C.
116 Mistletoe St.
P.O. Box 1061
Medford, OR 97501
Fax: 1.888.866.4720
Email: thad@Guyeryers.com and stephani@GuyerAyers.com
Tel: 202.417.3910/Mobile 206.954.1293 (Guyer) 813.382.7865 (Ayers)

Attorneys for Plaintiff Burris

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **Johnny E. Burris**, | |
| Plaintiff, | Case No. _____ |
| v. | |
| | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| **J.P. Morgan Chase & Co**., and **J.P. Morgan Securities, LLC,** | |
| | ***DEMAND FOR JURY TRIAL*** |
| Defendants. | |

Plaintiff, through his counsel, alleges as follows:

## I.  INTRODUCTION

1.    Plaintiff, Johnny E. Burris, files this complaint of whistleblower retaliation pursuant to the employee protection provisions of the Sarbanes-Oxley Act of 2002, and the Dodd-Frank Wall Street Reform and Consumer Protection

Act of 2010.  Plaintiff alleges that he was wrongfully terminated from his employment, and thereafter blacklisted by the Defendants.  This termination and blacklisting was motivated in whole or in part because Plaintiff objected to pushing proprietary J.P. Morgan Private Bank Managed Accounts, Chase Strategic Portfolio Managed Accounts, and proprietary mutual funds into his clients' portfolios on the grounds that he viewed such "bank managed products" as not always suitable for his retired clients. After he was wrongfully terminated, Defendants blacklisted Plaintiff by drafting three false customer complaints that were then sent to the Financial Industry Regulatory Authority (FINRA) and made public.

2.      Following an investigation by a duly-authorized investigator, the Secretary of Labor, acting through his agent, the Regional Administrator for the Occupational Safety and Health Administration (OSHA), Region IX, found reasonable cause to believe that Defendants violated SOX in both terminating and blacklisting the Plaintiff.

## II.  <u>JURISDICTION</u>

3.      Jurisdiction of this action is established under 28 U.S.C. §1331 on the basis that this complaint presents federal questions under the Sarbanes-Oxley Act, 18 U.S.C. §1514A, and the Dodd-Frank Wall Street Reform and Consumer Protection Act, in 15 U.S.C. § 78u-6(h).

4. Plaintiff administratively exhausted his claims under the Sarbanes-Oxley Act in the United States Department of Labor, Occupational Safety and Health Administration, and thereafter in the Office of Administrative Law Judges (OALJ). More than 180 days have lapsed since the filing of Plaintiff's DOL-OSHA complaint on April 30, 2013.

5. Plaintiff has provided the required notice to the DOL-OALJ under 29 C.F.R. Part 1980.114 of the filing of his Sarbanes-Oxley claim in this court and invoking the *de novo* jurisdiction of this court pursuant to 18 U.S.C. § 1514A(b)(1)(B).

### III.  VENUE

6. Venue lies in this United States District Court under 28 U.S.C. § 1991(b) and (c) by virtue of the fact that the Defendants do business in offices located in and/or operated in this judicial district, and a significant amount of the conduct complained of herein occurred in this judicial district.

### IV.  PARTIES

7. Plaintiff is a citizen of the United States and a resident of the State of Arizona. Plaintiff was employed as a "Private Client Advisor" by Defendant J.P. Morgan Securities LLC, a wholly-owned subsidiary of Defendant J.P. Morgan Chase & Co., a company covered by the anti-retaliation provisions of both SOX and Dodd-Frank.

8.     Defendant J.P. Morgan Chase & Co. is an investment firm that maintains its principal executive offices in New York, New York, and is registered with the Securities Exchange Commission ("SEC").  It is a company within the meaning of 18 U.S.C. §1514A because it has issued a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. §78l) and is required to file reports under Section l5(d) of the Securities Exchange Act of 1934 (15 U.S.C. §78O(d)).

9.     The Defendants employ investment advisors located in offices in Arizona who regularly transact business in this state. J.P. Morgan Chase & Co. exercises control over J.P. Morgan Securities LLC, including its policies and procedures that are authorized and approved by J.P. Morgan Chase & Co. (hereafter JPMC).

## V. <u>BACKGROUND FACTS</u>

10.     Plaintiff was employed by JPMC from June 21, 2010, until he was involuntarily terminated on November 6, 2012.  He began working as a financial advisor associate for JPMC in its Sun City West, Arizona branch.   JPMC had been offering various "bank managed products" to its clients that financial advisors like Plaintiff were expected to sell. These products were managed by a team of professionals who were supposed to make allocation decisions based on a variety of risk tolerance factors for each client and in each client's interests.

11.     Defendants offered two main bank managed products, to wit, those in the Chase Strategic Portfolio (CSP), and those in the JP Morgan Investment Portfolio (JPMIP).  Generally, for clients who were investing less than $500,000, Defendants offered CSP. Its funds management team allocated a certain percentage of the client's money into defendants' own mutual funds, and a certain percentage into outside funds. Defendants offered 26 choices of CSP allocations allegedly based on what was most suitable for the client, including age and risk tolerance. CSP proved very profitable for Defendants, allowing the company to levy an annual fee as high as 1.6% as well as earning fees on Defendants' mutual funds within the managed product. This recurring annual fee could be up to and in some cases exceeding 1067% (1.60 / .15) income per year more than a comparable Class A share mutual fund 12b-1 annual payment. In the event of a Class C share, the recurring annual fee could be up to or exceeding 246% (1.6 / .65) or more per annum.

12.     For higher-end clients who were investing more than $500,000, Defendants used the alternative managed fund, JPMIP, through Chase Private Client (CPC).  Plaintiff understood that JPMIP had a 30% stock position and a 70% position in non-stock. The average age of a Sun City West community retiree is about 70-75 years old. This was simply too much risk for these retirees to accept,

especially after the 2008 financial collapse that had occurred only a few years prior.

13.    Plaintiff was also assigned to exchange or switch non-managed money accounts, particularly class "A" and class "C" mutual funds. Class A mutual fund could pay Plaintiff more commissions in the short term than managed money accounts, but less in the long term. Class C mutual funds typically offered less commission in both the short and long term. Plaintiff was pressured by his senior manager to sell equity linked indexed annuities and according to the Regional Manager, Philip Haigis, "so that can offset your managed money fees."

14.    Upon his hiring, Plaintiff was being directly pressured by several managers to sell a larger volume of bank-managed products to his clients. As a prior President/ CEO of a Registered Investment Advisory firm, Plaintiff was receptive to managed accounts and fiduciary duties. However, managed accounts must have proper disclosures and the firm must fully discharge its fiduciary responsibilities.

15.    The Private Bank account, JPMIP, was not offered by Plaintiff until after his promotion to Private Client Advisor in May 2012.  He initially regarded the hypothetical sales presentation of JPMIP as promising. The returns seemed reasonable in a low rate environment with low volatility. An example of this product push was on January 25, 2011, when Regional Manager Robert Garrett

emailed Plaintiff's management stating: "We LOVE Managed Money in the West!!! Operation Hunt AND Gather is underway!!!"  This text spotlighted a western region that sold a high number of bank-managed products in December 2011. Plaintiff became the number two producer in all of Arizona and Nevada for proprietary product sales in 2011.

16.     In mid-2011, Plaintiff noticed significant differences between the hypothetical model and the actual return. The actual return was significantly lower. Mr. Burris began to slow the sales into CSP. Despite Defendant having the actual returns, they were not placed on the CSP hypothetical model. That was changed only after Plaintiff's termination.

17. On January 31, 2012, in a meeting with three levels of managers, the most senior executive in that meeting, Regional Manager Phil Haigis told Plaintiff that he needed to consider selling substantial volume of bank-managed products and that his ability to get promoted would be based on his percentage of managed money sales.

18.     On June 27, 2012, former supervisor Andrew Held commented that it was odd Plaintiff was not selling JPMIP managed money accounts. On July 2, 2012, Mr. Held again indicated it was odd Plaintiff had not done any JPMIP business even though he had presented the product line to thirty new clients. On

August 14, 2012, Mr. Held wrote on Plaintiff's mid-year evaluation that he "has the

opportunity to continue his high growth business trajectory by integrating the J.P. Morgan CPC platform more fully into his business during the 2nd half of 2012."

19.     In mid-July 2012, Andrew Held alleged that Plaintiff had mismarked two trades as "unsolicited" when according to Mr. Held the trades were solicited. Mr. Held drafted a Letter of Education ("LOE") dated September 5, 2012, delivered by email by Mr. Held's assistant Vicki Turner on September 14, 2012. The letter was drafted nine days before JPMC ever contacted the client and presented for Plaintiff's signature only hours before that client contact.

20.     During his first meeting with co-supervisor Deborah Valenzuela in early October 2012, she specifically asked Plaintiff why he did not sell more bank managed products.  She indicated that he was an outlier because his client sales book was only 20% of managed accounts with only one CPC product.  She also told Plaintiff that it was part of his job to sell bank-managed products and provide clients the whole menu of items Defendants offered.

21.     Defendants pushed Plaintiff and other financial advisors to sell these bank managed products and mutual funds to generate more income for the company despite the increased risk being inappropriate for many clients.   This was never disclosed to clients.

22.     The SEC determined in its $267 million settlement with Defendants that they failed to disclose their own profit-motivated preference for bank-managed products, as set forth in SEC Press Release No. 2015-283 (Dec. 18, 2015):

> JPMS ... failed to disclose its preference for J.P. Morgan-managed mutual funds for retail investors in a unified managed account program known as ... CSP that was sold through Chase Bank branches ...  JPMS failed to disclose that certain J.P. Morgan managed mutual funds purchased for CSP clients offered a less expensive share class and would generate less revenue to a JPMS affiliate than the share class JPMS chose for CSP clients.

23.     Per CFTC Docket No. 16-05, the Commodities Futures and Trade Commission (CFTC) also levied a fine on December 18, 2015, against J.P. Morgan Chase Bank (JPMCB) and ordered the firm to pay a $40 million civil monetary penalty, to pay disgorgement in the amount of $60 million, and to cease and desist from further conflict of interest and steering violations to achieve the firm's preference for its own proprietary funds as charged.

24.     Defendants incentivized brokers to sell such bank-managed products by tying a portion of their bonuses to the amounts of bank-managed products they sold.  In Press Release No. 2016-1 (Jan. 6, 2016), the SEC announced findings that in a related $4 million settlement with Defendants, that "although [JPMS] did not pay commissions to registered representatives in its U.S. Private Bank, compensation was not based on client performance," as JPMS advertised, but that

"[a]dvisors were instead paid a salary and a discretionary bonus based on a number of other factors." One of these factors was self-dealing in managed bank products.

25.     Broker-dealers and financial advisors employed by JPMS were situated to have ongoing self-interests in representing to clients and the public that their monetary interests were aligned with their customers.  JPMS misled customers by falsely claiming that the compensation of its registered representatives was tied to the success of the client's portfolio rather than their own self-interests.

26.     Plaintiff generated many non-bank managed assets for Defendants. On February 1, 2012, he received an "exceeds" for his 2011 performance review. Plaintiff was one of the highest net new money producers in the region with approximately $30 million being acquired per year during 2011 and through to the time of his termination.

27.     On May 15, 2012, Plaintiff was promoted to "Private Client Advisor," and started working with higher income clients.

28.     On October 4, 2012, manager Jamie Cecich indicated to co-supervisor Deborah Valenzuela that Defendants could not afford to lose Plaintiff's level of production.

29.     By the date he was terminated, Plaintiff was ranked fourth in Defendants' Arizona and Nevada territory for sales.

# VI.  PROTECTED ACTIVITY

30.     Plaintiff raised concerns to his management, including Ms. Valenzuela, Umbreen Kazmi, and John Quinn to the effect that Defendants were misleading customers by falsely claiming that sales advice to clients was based on suitability for their portfolios rather than on Defendants' own self-interests.

31.     On January 31, 2012, Plaintiff told Mr. Haigis, Mr. Held, and manager Joseph Agresti that he would only sell managed funds if they were suitable for his ultraconservative clients who wanted safe fixed income accounts.

32.     On June 27, 2012, Plaintiff informed Mr. Held that (1) he did not believe JPMIP was appropriate for his elderly and conservative clients because the fund was too volatile; (2) he would not sell a bank managed product if the client was elderly and did not want any stock in the portfolio; and (3) some older clients who want securities did not want JPMIP because they did not want to pay the 1% fund management costs in addition to the recurring annual fee of up to 1.60%.

33.     On June 28, 2012, Plaintiff emailed Mr. Haigis and Mr. Held stating:

I will sell CSP, JPMIP, [and other special company products] ... when appropriate. As an [Investment Advisor Representative] we are bound by fiduciary responsibilities to the client. Also, SEC guidelines want to insure the client is in the right account for their stated objective. With that being said, that account for many of my client's will be CSP Income and "C" Shares. JPMIP is too aggressive for many of my clients. There will be occasions it is appropriate for a client to be in JPMIP and other CPC products. When that is appropriate, I will make those recommendations ...  I hope to continue to work for Chase but I need ... clarification on something. If I don't sell "bank managed

products" (i.e., JPMIP, DYS, FEI, BREWs, etc.), is my career or employment with Chase and or JP Morgan jeopardized?"

34.     On July 2, 2012, Plaintiff told Mr. Held that he would not sell JPMIP to his clients if it was not suitable to their individual portfolios.

35.     In early October 2012, Plaintiff informed Ms. Valenzuela that bank-managed products were not appropriate for his clients because they needed fixed income. Shortly afterwards, on October 5, 2012, Ms. Valenzuela emailed Mr. Quinn that Plaintiff "has only done one bank managed account since [being promoted to a Client Private Advisor]. He says his clients all need fixed income so the menu is not appropriate."

36.     On October 8, 2012, Plaintiff emailed Ms. Kazmi:

> I do think CSP will benefit [a client] ... At this point, there is no real detriment to [the client]. The only thing I don't like is the idea that over 65% of the funds are specifically in JP Morgan funds. I believe down the line we may have a legal issue with this. As you know, a managed account we have a fiduciary responsibility to the client. Not only to use [Defendant] accounts but the best available. I sometimes question why we have such a large % in [Defendants'] funds."

37.     After Plaintiff was terminated, he provided information to the New York Times that led the newspaper to feature his allegations that he was terminated for refusing to sell bank-managed products on March 2, 2013.

38.     After his termination from employment, Plaintiff notified the SEC, FINRA, and the Office of the Comptroller of the Currency (OCC) of the above-specified J.P. Morgan activities to which he objected.

39.     Plaintiff disclosed comprehensive information to the SEC describing how J.P. Morgan was "pushing" or "steering" clients into the J.P. Morgan CSP, JPMIP, and mutual funds. Plaintiff did so through his Tip, Complaint, and Referral form (TCR) dated December 6, 2012, and subsequent supplementations on and after February 6, 2013.

## VII.  RETALIATORY ACTIONS

### A. Suspension:

40.     Plaintiff suffered an adverse action when he was suspended from performing his employment duties on November 1, 2012.

### B. Termination:

41.     Plaintiff suffered an adverse action when he was terminated from his employment on November 6, 2012. The "decision" to terminate was made on November 2, 2012, but first communicated to Plaintiff four days later.

### C. Blacklisting:

42.     Plaintiff suffered an adverse action when J.P. Morgan management, outside of company procedures, inappropriately reduced three oral customer complaints to writing, and one thereafter listed said customer complaint in Plaintiff's FINRA BrokerCheck records in June 2013.  One of the Brokercheck

listings had the effect of blacklisting Plaintiff and causing him reputational harm because BrokerCheck reports are publicly available information to potential investors and employers regarding alleged misconduct by a broker or sales agent such as Plaintiff.  The information in these reports is considered part of the securities industry's registration and licensing processes.

43.     Notwithstanding that Defendants later amended Plaintiff's BrokerCheck report in early August 2013 indicating that it denied said customer complaint, the mere listing of even the denied complaint would cause future clients or brokerage employers not to retain his services.

44.     Ms. Umbreen Kazmi, in her capacity of "Corporate Officer" and "Supervisory [Compliance] manager" provided misleading information to FINRA arbitrators regarding the role of JPMC personnel in drafting said client complaints. Thereafter JPMC knowingly failed to notify regulators of having provided said misleading information.

45.     These blacklisting activities independently inflicted emotional and financial injuries to Plaintiff in addition to those inflicted by the termination itself.

## VIII.   NEXUS AND PRETEXT

46.     Plaintiff's disclosures and objections to Ms. Valenzuela in early October 2012, and his email to Ms. Kazmi on October 8, 2012, as set forth above, occurred approximately one month prior to the November 4, 2012 decision to

terminate Plaintiff made by managers Ms. Kazmi, Ms. Valenzuela, Mr. Quinn, and Al Barrows.

47.    On October 29, 2012, Ms. Kazmi emailed Mr. Barrows that Plaintiff had $74 million in non-money managed accounts and $16 million in managed accounts. On October 31, 2012, Mr. Quinn emailed the Disciplinary Action Committee (DAC), Ms. Kazmi, and Ms. Valenzuela that Plaintiff had 18% of his assets in managed and 82% of his assets in non-managed accounts. In the DAC's November 2, 2012 recommendation to issue Plaintiff a written warning pending further review, the DAC made this same observation.

48.    Defendants' decision to terminate Plaintiff instead of issuing him a written warning was inconsistent with Defendants' disciplinary policies and procedures. After consultation with Defendants' DAC, Ms. Kazmi, Ms. Valenzuela, Mr. Barrows, and Mr. Quinn decided to suspend Plaintiff on November 1, 2012, made the decision to terminate him on November 2, 2012, and conducted an audit of his desk on November 3, 2012.  Despite Ms. Kazmi alleging that the documents discovered on November 3, 2012 were "the straw that broke the camel's back", the "decision" to terminate Plaintiff was made the day before said documents were allegedly found. Prior to the November 3, 2012 desk audit, these four individuals planned to issue Plaintiff only a written warning for three issues:

(l) unprincipled correspondence, (2) marking two "solicited" trades "unsolicited," and (3) a high volume of Principal Review Desk (PRD) flagged trades.

49.     During the desk audit, Ms. Kazmi and Ms. Valenzuela asserted three additional issues: (l) several additional alleged unprincipled correspondences, (2) a blank signed mutual fund disclosure form, and (3) a signed switch form that did not list what the client was switching out of. As a result of these three additional issues, Ms. Kazmi, Ms. Valenzuela, Mr. Quinn, and Mr. Barrows allegedly decided on November 4, 2012, to elevate their previously planned written warning to a termination.

50.     However, these three "new" issues were either not issues or demonstrated disparate treatment. Regarding the unprincipled correspondence, all but one of the alleged 21 "unprincipled letters" found were letters to mutual funds or insurance companies that Mr. Held specifically indicated on April 29, 2012, and July 19, 2012, that Plaintiff did not need to be "principled" prior to sending out.

51.     Regarding the blank signed mutual fund disclosure form, Defendants treated Plaintiff differently from other employees. Many employees who also were found to have blank or incomplete forms only received a LOE, Defendants' lowest form of formal written discipline.

52.     Similarly, regarding the signed switch form that did not list what the client was switching out of, Plaintiff was also disparately treated.  Like the blank

signed mutual fund disclosure form, many employees only received a LOE for blank or incomplete forms.

53.     Defendants had never previously formally disciplined Plaintiff and did not follow their progressive disciplinary policy, but instead went outside their normal disciplinary tract to terminate Plaintiff.

## VIII.     FEDERAL CAUSES OF ACTION:

### COUNT ONE: DISCRIMINATION IN VIOLATION OF SECTION 806 OF THE SARBANES-OXLEY ACT OF 2002

54.     Plaintiff realleges Paragraphs 1 through 53 above.

55.     The complaints, disclosures, and information provided by Plaintiff to his managers, the SEC, and the U.S. Department of Labor, as set forth above, constituted protected activity under the employee protection provisions of Section 806 of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A(a)(1) and (2), which prohibits any adverse action against an employee who has taken, or was preparing to take, action "to provide information *** regarding any conduct which the employee reasonably believes constitutes a violation of *** any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders***".

### A. Disclosure of Suitability Rule Violations:

56.     Plaintiff engaged in protected activity when he repeatedly raised concerns about the suitability of selling bank-managed products, including CSP

and JPMIP, to his elderly and retired clientele, in violation of applicable suitability rules including FINRA Rule 2111.  The SEC enforces suitability rules, and Section 206 of the Investment Advisers Act of 1940, 15 U.S.C. §80b-1 et seq., as well as a general duty upon regulated entities and persons to provide only suitable investment advice that is in the client's interests.

57.    Plaintiff engaged in protected activity when he repeatedly refused to sell Defendants' financial products unless they were suitable, appropriate, and in his clients' best interest when acting in a fiduciary capacity to them.  Plaintiff explained to his supervisors the reasons he was refusing to do so.

58.    Plaintiff engaged in protected activity when he communicated information to the New York Times that featured his allegations that he was terminated for refusing to sell unsuitable bank-managed products.   Such communications constituted a preliminary step in the process of disclosing wrongdoing that could result in initiation of a formal "proceeding" under SOX §1514A(2).

**B.  Disclosure of Internal Controls Failures**

59.    The most fundamental protection against false or misleading financial practices or omissions as to Defendants' results of operations, profitability, fraud detection, and shareholder fraud is the company's maintenance of a reliable and

effective system of internal controls. The Defendants are required by securities law and regulations to implement internal control policies.

60.     In its SEC filings and public statements, the Defendants expressly and/or impliedly represented that they had effective internal controls and had disclosed all significant deficiencies in the design or operation of internal controls which could adversely affect their ability to accurately record, process, summarize and report financial data and regulatory compliance.

61.     Plaintiff's disclosures and criticism to Defendants' officials, as set forth in this complaint, establish a reasonable belief that all such disclosures have not fully and truthfully been made to the external auditors, the SEC, and shareholders.

## C. Providing Information to a Section 1514A(a)(1)C) Investigation

62.     The DOL's investigation into Plaintiff's complaint, the FINRA proceedings, and Defendant's internal investigation thereof constituted an "investigation" to which Plaintiff had "provided information", and was about to provide more information, within the meaning of 18 U.S.C. § 1514A(a)(1)(C). Retaliation for his intended or actual participation therein was unlawful.  It is an independent violation of the Act for Defendants to retaliate against Plaintiff during or because of his initiation of and participation in said investigations and proceedings.

63.     Retaliation for Plaintiff's above referenced protected activity was a contributing factor in the Defendants' above referenced adverse actions against him, to wit, placing him on suspension and subsequently terminating his employment and blacklisting him.   Such retaliation was in violation of Section 806 of the Sarbanes-Oxley Act.

64.     Plaintiff has suffered loss of income, damage to his career, and severe emotional, mental, and physical distress and anxiety.

**COUNT TWO: DISCRIMINATION IN VIOLATION OF SECTION 922 OF THE DODD FRANK ACT OF 2010**

65.     Plaintiff realleges Paragraphs 1 through 64 above.

66.     After being terminated from his employment, the Plaintiff made disclosures to the SEC of comprehensive information describing how J.P. Morgan was "pushing" or "steering" clients into the J.P. Morgan CSP, JPMIP, and mutual funds. Plaintiff did so through his Tip, Complaint, and Referral form (TCR) dated December 6, 2012, and subsequent supplementations on and after February 6, 2013.

67.     The complaints, disclosures, and information provided by Plaintiff to his managers and the SEC as set forth above, constituted protected activity under Section 922 of the employee protection provisions of the Dodd Frank Act, 15 U.S.C. § 78u-6(h), which incorporates protections for disclosers of violation under Section 806 of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A(a)(1) and (2).

## IX.  REQUEST FOR RELIEF

Plaintiff respectfully requests that he be awarded the following relief:

a.   Reinstatement to his employment, and if reinstatement is not ordered, then front pay for a period of at least five years;

b.  Upon reinstatement, an injunction to the Defendants to remediate the hostile work environment, harassment and intimidation to which the Plaintiff was subjected;

c.  Back pay for all lost wages, income, and benefits;

d.  Economic damages for injury to Plaintiff's career, professional reputation and earning capacity, in the amount of at least $1,000,000, or an amount to be determined at trial;

e.  $1,000,000 in non-economic damages for mental and emotional distress, embarrassment and humiliation, or an amount to be determined at trial;

f.  Expungement of written warnings, reprimands, negative performance appraisals and other derogatory information and references which have been placed in the Plaintiff's personnel file, including the removal of all complaints, any references to his termination, and any resulting references to derogatory or adverse actions from Plaintiff's FINRA Central Registration Depository.

g.  Posting of a notice to Defendants' employees indicating that they have been ordered to comply with the whistleblower provisions of the Sarbanes-Oxley Act and Dodd Frank Act, and to make appropriate restitution to the Plaintiff;

h.  Reasonable costs and attorney's fees, together with all other relief available from law and equity, including the costs of expert witnesses.

PLAINTIFF DEMANDS A TRIAL BY JURY.

DATED this 24th day of September, 2018.


s/Thad M. Guyer
Thad M. Guyer, *Pro Hac Vice* (Oregon # 82144)
Stephani L. Ayers, *Pro Hac Vice* (Washington #31610)

Attorneys for Plaintiff