**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Johnny E Burris, | No. CV-18-03012-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| JPMorgan Chase & Company, et al., | |
| Defendants. | |

## INTRODUCTION

Plaintiff Johnny Burris ("Plaintiff") worked as a financial advisor for J.P. Morgan Chase & Co. and J.P. Morgan Securities, LLC (together, "Defendants") until November 2012, when he was terminated.  In this action, which was filed in September 2018 (following an array of related proceedings between the parties in other forums), Plaintiff contends that he was fired for complaining about Defendants' efforts to push investors into risky, "bank managed" financial products and then improperly blacklisted from the financial industry, in violation of the whistleblower retaliation provisions of the Sarbanes-Oxley Act of 2002 and the Dodd-Frank Act of 2010.

The current issues before the Court, however, have nothing to do with whistleblower retaliation.  Instead, they arise from Plaintiffs' systematic efforts to destroy electronically stored information ("ESI") from an array of phones, laptops, email accounts, and external storage devices.  Plaintiff's evidence-destruction efforts took a variety of forms, including the repeated use of software programs called "BleachBit" and "iShredder," and spanned a

period of years, beginning before (but in anticipation of) this litigation and accelerating as the litigation unfolded.  Eventually, a court-appointed forensic expert was tasked with investigating the scope of Plaintiff's efforts to destroy ESI, but the day before Plaintiff produced certain devices to the expert, he used wiping software on them, too.  Based on this and other conduct, the expert concluded, "to a reasonable degree of scientific certainty, that [Plaintiff] caused Potentially Relevant ESI to be irrevocably lost from his Electronic Media."  (Doc. 73-1 at 3.)

Following the issuance of the expert's report, Defendants filed a motion for terminating sanctions.  (Docs. 78 [sealed], 84 [unsealed].)  That motion, as well as Plaintiff's motion for leave to belatedly submit certain exhibits in opposition to the sanctions motion (Doc. 92), are now fully briefed and ripe for resolution.  For the reasons that follow, Defendants' motion is granted, Plaintiff's motion is denied, and this action is terminated.

# BACKGROUND

## I.    Background Allegations

The background details of this case, which taken from Plaintiff's complaint (Doc. 1) and the parties' Rule 26(f) report (Doc. 19), are as follows.

On June 21, 2010, Plaintiff was hired as a financial advisor associate in Defendants' Sun City West, Arizona branch.  (Doc. 1 ¶ 10.)  After his hiring, Plaintiff contends that he was "directly pressured by several managers" to sell certain financial products that Defendants managed.  (Id. ¶ 14.)  Specifically, Plaintiff contends that, in or before January 2012, he "raised concerns" to his superiors that "Defendants were misleading customers by falsely claiming that sales advice to client[s] was based on suitability for their portfolios rather than on Defendants' own self-interests."  (Id. ¶¶ 30-31.) Plaintiff further contends that, in June and July 2012, he raised concerns about the appropriateness of certain financial products for "his elderly and conservative clients."  (Id. ¶¶ 32-34.)  Plaintiff also contends that, in October 2012, he "informed" a superior "that bank-managed products were not appropriate for his clients."  (Id. ¶ 35.)

In November 2012, Plaintiff was suspended and then terminated by Defendants. (*Id.* ¶¶ 40-41.)  Plaintiff contends that, "[a]fter being terminated from his employment, [he] made disclosures to the SEC of comprehensive information describing how [Defendants were] 'pushing' or 'steering' clients into [Defendants'] mutual funds.  Plaintiff did so through his Tip, Complaint, and Referral form (TCR) dated December 6, 2012, and subsequent supplementations on and after February 6, 2013."  (*Id.* ¶ 66.)

Plaintiff contends that, at an unspecified point, Defendants acted "outside company procedures" by "inappropriately reduc[ing] three oral customer complaints [against Plaintiff] to writing."  (*Id.* ¶ 42.)  Plaintiff further contends that, in June 2013, Defendants listed at least one of those complaints "in Plaintiff's FINRA BrokerCheck records."  (*Id.*)  According to Plaintiff, this "had the effect of blacklisting Plaintiff and causing him reputational harm because BrokerCheck reports are publicly available information to potential investors and employers regarding alleged misconduct by a broker or sales agent such as Plaintiff."  (*Id.*)

Based on these and other allegations, Plaintiff asserts the following claims against Defendants: (1) discrimination in violation of § 806 of the Sarbanes-Oxley Act of 2002 (*id.* ¶¶ 54-64); and (2) discrimination in violation of § 922 of the Dodd-Frank Act of 2010 (*id.* ¶¶ 65-67.)  In the Rule 26(f) report, Plaintiff summarizes his theory of liability as follows:

> Plaintiff alleges that he was wrongfully terminated from his employment, and thereafter blacklisted by the Defendants.  Plaintiff alleges his termination and blacklisting were motivated in whole or in part because Plaintiff objected to pushing proprietary J.P. Morgan Private Bank Managed Accounts, Chase Strategic Portfolio Managed Accounts, and proprietary mutual funds into his clients' portfolios on the grounds that he viewed such "bank managed products" as not always suitable for his retired clients.  After he was wrongfully terminated, Defendants blacklisted Plaintiff by drafting three false customer complaints that were then sent to the Financial Industry Regulatory Authority (FINRA) and made public.

(Doc. 19 at 2.)  As remedies, Plaintiff seeks, *inter alia*, reinstatement or front pay, back pay, economic damages of at least $1 million, and non-economic damages of $1 million. (Doc. 1 at 21-22.)

- 3 -

II.    Related Proceedings

    A.    **The FINRA Arbitration**

In January 2013—that is, about two months after his termination—Plaintiff filed a statement of claim against Defendants with FINRA.  (Doc. 78-39 at 2.)  In that proceeding, Plaintiff eventually asserted claims for wrongful termination, breach of contract, defamation, and intentional interference with contract/prospective economic advantage. (*Id.* at 3.)

In August 2014, following a two-week arbitration proceeding, the FINRA arbitration panel denied Plaintiff's claims in their entirety.  (*Id.* at 4-9.)

    B.    **The OSHA Proceeding**

In April 2013, Plaintiff filed a whistleblower claim against Defendants with the Occupational Safety and Health Administration ("OSHA").  (Doc. 1 ¶¶ 2, 4; Doc. 84 at 4 n.5.)

In January 2017, an OSHA administrator made a preliminary finding in Plaintiff's favor, which Plaintiff characterizes as a finding of "reasonable cause to believe that Defendants violated SOX in both terminating and blacklisting the Plaintiff" (Doc. 1 ¶ 2) and which Defendants characterize as "a non-binding, preliminary determination in favor of [Plaintiff]" (Doc. 84 at 5 n.4).  According to Defendants, the OSHA administrator "also determined that Defendants would have been justified in terminating [Plaintiff] by March 2013."  (Doc. 84 at 4 n.5.)

Following the OSHA administrator's ruling, "[a]ll parties appealed, but [Plaintiff] opted to bring his claims before this Court."  (*Id.*)

    C.    **The FINRA Disciplinary Proceeding**

In September 2016, FINRA initiated a disciplinary proceeding against Plaintiff. (Doc. 78-40 at 2.)  The complaint alleged that Plaintiff engaged in the following forms of misconduct while employed by Defendants: (1) failing to execute a customer trade request; (2) attempting to settle a customer complaint related to the unexecuted trade without notifying Defendants; and (3) engaging in unauthorized communications in the course of

the settlement effort by sending letters to customers and the IRS using "letterhead that appeared to be official, firm-sanctioned . . . letterhead even though it was not." (*Id.* at 3-9.)

In April 2017, Plaintiff submitted an offer of settlement in which he "consented, without admitting or denying the allegations . . . , to the entry of findings and violations consistent with the allegations." (*Id.* at 2.) FINRA accepted Plaintiff's offer, entered findings consistent with its allegations, and imposed sanctions against Plaintiff. (*Id.* at 9.)

III.   Relevant Procedural Background

On September 24, 2018, Plaintiff initiated this action by filing the complaint. (Doc. 1.)

On October 1, 2019, the Court granted the parties' stipulated protective order, which sought to "facilitate document production and disclosure and to protect the respective interests of the parties in their confidential information." (Doc. 30 at 1.)

On March 18, 2020, the Court granted the parties' request to adopt the first addendum to the stipulated protective order, which allowed third-party service providers to produce certain records and information pertaining to Plaintiff. (Doc. 35.)

On October 29, 2020, the Court granted the parties' request to adopt the second addendum to the stipulated protective order. (Doc. 61.) The second addendum called for the appointment of "an independent expert qualified in digital forensics and electronic discovery" to "serve as an Officer of the Court." (Doc. 61 at 3.) It also ordered Plaintiff to "provide the expert and Defendants a list identifying all his Electronic Media that at any point contained Potentially Relevant ESI." (*Id.* at 4.) The expert was instructed, upon Defendants' request, to "investigate and advise the parties and/or the Court whether . . . Potentially Relevant ESI was deleted, manipulated, removed from, or concealed from detection on Plaintiff's Electronic Media." (*Id.* at 5-6.) Plaintiff was warned that "Defendants may seek . . . appropriate sanctions up to and including default . . . if Plaintiff: unreasonably fails to identify or provides misleading information concerning his Electronic Media and Potentially Relevant ESI; obstructs, attempts to evade, or unduly delays the . . .

1   efforts as provided herein; deleted or failed to preserve Potentially Relevant ESI while
2   under a duty to preserve it; or engaged in any other discovery misconduct." (*Id.* at 8.)

3       On April 22, 2021, the parties submitted the forensic report from the court-
4   appointed expert. (Doc. 73-1.) The report had last been updated on April 8, 2021. (*Id.* at
5   1.) The parties also advised the Court that Defendants would be filing an opposed motion
6   for case-terminating sanctions based on the findings in the report. (Doc. 73 at 2.)

7       On April 29, 2021, the Court issued the revised Rule 16 case management order.
8   (Doc. 77.) Among other things, it provided that "Defendants' Motion for Sanctions shall
9   be filed no later than July 9, 2021; Response shall be filed no later than July 30, 2021;
10  Reply shall be filed no later than August 13, 2021." (*Id.* at 3.)

11      On July 9, 2021, Defendants filed their motion for sanctions. (Doc. 78.) Although
12  it was initially filed with redactions, an unsealed version was later filed. (Doc. 84.)

13      On August 3, 2021, after obtaining an extension (Docs. 86, 87), Plaintiff filed an
14  opposition to the motion for sanctions. (Doc. 89.)

15      On August 15, 2021, Plaintiff filed a motion for leave to file omitted exhibits. (Doc.
16  92.)

17      On August 16, 2021, Defendants filed an opposition to the motion for leave to file
18  omitted exhibits. (Doc. 97.) That same day, Plaintiff filed a reply in support of the motion
19  for leave to file omitted exhibits. (Doc. 98.)

20      On August 17, 2021, Defendants filed a reply in support of their motion for
21  sanctions. (Doc. 99.) Neither side requested oral argument or an evidentiary hearing as to
22  either of the motions.

23                            **DISCUSSION**

24  I.   Motion To File Omitted Exhibits

25      Although the sanctions motion was filed first, Plaintiff's motion for leave to file
26  omitted exhibits will affect the evidence the Court can consider as part of the sanctions
27  motion. Thus, the Court begins there.

28          …

A.   **Background**

During the forensic review process, over 700 document artifacts were recovered from the "recycle bin" folders of Plaintiff's electronic devices.  (Doc. 73-1 at 21.)  Notably, "many of the original files that generated these artifacts had file names and pathing that made them likely relevant and responsive to [Defendants'] discovery requests."  (*Id.*)  As a result, Defendants asked the court-appointed expert to answer a series of questions and conduct additional analysis concerning the recovered artifacts.  (*Id.* at 21-23.)  Among other things, Defendants asked if the expert could "recover the original files in [Plaintiff's] $Recycle.Bin . . . and re-run our [list of keyword] searches across the recovered files."  (*Id.*)

In the updated report issued on April 8, 2021, the expert answered this question as follows: (1) the 700+ artifacts were associated with "528 unique files"; (2) of the 528 unique files, 290 "were presumably already included in the searching that [was previously] performed"; (3) of the remaining 238 files, "file record references were found to 206 that were overwritten but had been present at one time on one or more of the devices.  Those 206 items are noted in the 'Overwritten' Column"; and (4) as for the remaining 32 files, they were "found only as references in the $Recycle.Bin folder and nowhere else on the devices.  These 32 items are noted in the 'Not Found' column."  (*Id.* at 23.)

In their motion for sanctions, filed on July 9, 2021, Defendants identified the "recycle bin" evidence as one of the many grounds of which their sanctions request was premised.  Specifically, Defendants emphasized that Plaintiff "moved hundreds of files that 'hit' on relevant case search terms into the Recycle Bin, many of which could never be recovered and were later identifiable only by file name" and "'recycled' at least 49 files [on October 30, 2020] that hit on searches for Potentially Relevant ESI and continued to delete at least 289 other similar files through December 7, 2020, with many files unrecoverable because they were 'overwritten.'"  (Doc. 84 at 6, 9.)

On August 3, 2021, Plaintiff filed his response to Defendants' motion.  (Doc. 89.)  In his statement of facts, Plaintiff included a section with the heading "The Files Recovered

Are Not Relevant ESI and [Defendants Offer] No Proof, Only Speculation, That They Were." (*Id.* at 10.) Underneath this hearing, Plaintiff alluded to a "Table 1" that was purportedly attached to his brief. (*Id.*) Plaintiff described Table 1 as providing as follows:

> Of those alleged "Overwritten" or "Not Found" files that were allegedly "gone forever", the vast majority of said files are either already produced to JPM or in fact not relevant ESI. Many of these documents were renamed or misspelled, which made the material seem either overwritten or not found but was in fact there. This Table shows this was not the product of some intentional act of Plaintiff to delete or hide files.

(*Id.*) However, Table 1 was not actually included as an exhibit to Plaintiff's brief.

On August 15, 2021—two days before Defendants' reply in support of the sanctions motion was due—Plaintiff lodged a copy of Table 1 (as well as two other exhibits that were referenced in Plaintiff's response brief but not attached thereto) and asked that these "omitted" exhibits be deemed timely filed. (Doc. 92.)

## B. The Parties' Arguments

Plaintiff's only proffered justification for his failure to file Table 1 by the August 3, 2021 deadline is "good medical and logistical cause as described in the attached declaration of lead counsel, Thad M. Guyer." (Doc. 92 at 3.) In that declaration, Mr. Guyer ("Counsel") states that he "was diagnosed with a condition requiring a rebalancing of medications which has resulted in a temporary diminution of the number of hours per week [he can work] . . . . This has resulted in errors in projecting the number of days and hours a case segment or legal project may require." (Doc. 96 ¶ 2.) Counsel also states that "[a]fter reviewing [Defendants'] Motion for Sanctions on July 10, 2021," he discovered flaws in the expert reports and "tasked [his co-counsel] Ms. Ayers to work with [Plaintiff] to create a table" that would show those flaws. (*Id.* ¶ 4.) After Plaintiff submitted a first draft of the table, Ms. Ayers "then timely submitted" a second draft. (*Id.*) Counsel believed that the draft was "long and lack[ing] practical navigation and sorting capability" and decided that an acceptable draft could not be "completed even by the extended filing due date of August 3, 2021." (*Id.* at 2-3.) Counsel decided "it was better not to file . . . version

- 8 -

3 but to instead return it to Ms. Ayers to work with [Plaintiff] on version 4.  After the allegedly 'missing' files were located in duplicates within the ESI cache, [Counsel] directed Ms. Ayers to work with [Plaintiff] to populate version 5." (*Id.* ¶ 5.)  Counsel then transmitted a final version of Table 1, as well as the other two missing exhibits, to Defendants.  (*Id.* ¶ 6.)

Defendants oppose Plaintiff's motion.  (Doc. 97.)  In a nutshell, Defendants argue the motion should be denied because (1) Plaintiff cites "no procedural or substantive rule or law allowing" a party to ignore a deadline simply because it wishes to keep working on a document after the deadline has elapsed; (2) Plaintiff did not, upon missing the August 3, 2021 deadline, notify the Court or Defendants of his intention to seek leave to supplement the record, and instead "spent . . . next two weeks clandestinely 'working on' Table 1" before springing it on Defendants just before their reply was due; (3) Plaintiff cannot establish good cause for failing to file Table 1 by August 3, 2021 because it is responsive to a report that was issued in April 2021—meaning "Plaintiff has had months to formulate his response on this issue"; and (4) at any rate, the proffered exhibits are irrelevant because one doesn't even relate to the issues raised in the sanctions motion, the second is simply the full transcript of a meet-and-confer session as to which Defendants previously filed a transcript except, and as for the third, "nothing in Table 1 . . . justifies, or even addresses, the undisputed evidence of spoliation."  (*Id.* at 1-4.)

C.   **Analysis**

Because the August 3, 2021 deadline for Plaintiff to submit his response to Defendants' sanctions motion (which was necessarily, if implicitly, also the deadline for Plaintiff to submit any supporting exhibits) was established via a Rule 16 scheduling order, Plaintiff's current request—which is functionally an extension request—is governed by Rule 16(b)'s "good cause" standard.  *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607-08 (9th Cir. 1992).  "Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment. . . .  [C]arelessness is not compatible with a finding of diligence and offers no reason for a grant of relief. . . .  [T]he focus of the inquiry

is upon the moving party's reasons for seeking modification.  If that party was not diligent, the inquiry should end."  *Id.* at 609.

Here, Plaintiff was not diligent, so his request to belatedly file the three missing exhibits is denied.  Although the Court is sympathetic to Counsel's health issues, Counsel's declaration does not establish that those issues were the root cause of the belated submission.  To the contrary, the declaration establishes that Counsel possessed a draft of Table 1 before August 3, 2021, knew that the deadline was about to expire, yet still decided against filing Table 1 in favor of continued drafting.  This is not diligent conduct.

The absence of diligence is underscored by the broader context of this case.  As discussed above, the "recycle bin" issues were addressed at length in the court-appointed expert's report.  An updated version of that report was issued in early April 2021, nearly four months before Plaintiff's opposition brief and exhibits were due.  This was ample time for Plaintiff to prepare a table setting forth his view of the disputed issues.

Nor is there any merit to Plaintiff's contention that he "could not have anticipated" the need to prepare Table 1 until he reviewed Defendants' sanctions motion, which purportedly contained an "inapposite characterization" of whether "a subset of the 528 recycle bin files [w]as 'irrevocably lost." (Doc. 92 at 4.)  Plaintiff had fair notice, based on the findings and statements in the expert's report, that he would need to be prepared to address the "recycle bin" issues by the time he responded to Defendants' sanctions motion, regardless of the precise nature of the claims they made in that motion.  It was not diligent for Plaintiff to wait until the very end of this four-month window to begin preparing the table, then decline to file it on the filing deadline (even though a version was available for filing) simply because he believed it could profit from some additional fine-tuning.

Counsel's otherwise-admirable perfectionism is not an excuse, much less "good cause," for ignoring a deadline without requesting an extension of time.  Most lawyers would appreciate more time to hone an argument or perfect an exhibit, but granting an exception on those grounds would swallow the rule.

Finally, in an abundance of caution, the Court notes that it has reviewed the lodged

exhibits (Docs. 92, 93, 94) alongside the court-appointed expert's second memorandum of findings.  (Doc. 101-1.)  In the second memorandum, the expert opines that Table 1 does not materially change any of the conclusions set forth in the earlier report.  (*Id.* at 2.)  The Court agrees.  Thus, even Plaintiff had been allowed to belatedly submit the missing exhibits, the Court's ultimate conclusions set forth in Part II below would not change.

II.     Motion For Sanctions

    A.     **Facts Regarding Spoliation**

As noted, the court-appointed expert issued his updated report on April 8, 2021.  (Doc. 73-1.)  It includes the following summary of Plaintiff's spoliation-related conduct, grouped here by device type:

▪ iPhones:  The report concludes that Plaintiff "factory reset every one of his [six] previous iPhones, thereby permanently deleting the content of each device.  [Plaintiff] stated that he did this on all of his prior iPhones so that other family members could use the devices, despite the fact that none of these devices appear to have been used after their factory reset.  Had [Plaintiff] simply stored the phones without resetting them, we would be able to access all historical text messages (and other data) contained on the devices."  (*Id.* at 2.)  The report identifies the dates of the factory resets for Plaintiff's six iPhones as (1) December 29, 2016; (2) January 1, 2017; (3) September 16, 2017; (4) October 14, 2018; (5) November 19, 2020; and (6) February 7, 2021.  (*Id.* at 5.)  In addition to these factory-reset efforts, the report concludes that Plaintiff purchased and used iShredder, "a program specifically designed to destroy data,"[1] on his iPhone "possibly as early as [August 27, 2018] and as recently as [December 7, 2020]."  (*Id.* at 2.)

▪ Laptops:  The report concludes that Plaintiff "performed resets of both of the laptops he provided for imaging in this matter.  These resets likely occurred in September and October of 2020."  (*Id.* at 2.)  The report also notes that, in addition to these factory-

---

[1]     The report explains that iShredder "advertises that it can 'Securely Erase iPhone® and iPad® incl. temporary data cleaner' and that it will 'securely overwrite the free space using patented security standards, making it impossible to recover any deleted data.'  This iShredder iOS 4 software, like a factory reset, is designed to permanently destroy data contained on iPhones."  (*Id.* at 5.)

reset efforts, Plaintiff repeatedly used commercial software programs in an attempt to delete ESI from the older of his two laptops—specifically, in August 2018, Plaintiff installed and ran Bleachbit[2] and iShredder (*id.* at 5, 16); in March 2020, Plaintiff ran "anti-forensics feature of Bleachbit called 'chaff,' whereby the Bleachbit program creates a user defined amount of gibberish files designed to fill space on the hard drive [of the older laptop] and overwrite existing data" (*id.* at 17); and in December 2020, Plaintiff again ran iShredder (*id.* at 5).  Finally, the report concludes that Plaintiff attempted to deceive the forensic examiners by passing off a laptop he did not purchase until September 2020 (and which was not commercially available until June 2020) as the one of the laptops that was discussed during Plaintiff's March 2020 deposition.  (*Id.* at 2, 14-15.)

▪ Email Account:  The report concludes that Plaintiff "purged the content of his invst4u@cox.net email account" on several occasions after the initiation of this lawsuit, with the purging occurring "as recently as '2 or 3 months' prior to . . . December 5, 2020 . . . and likely also prior to the April 21, 2020 Cox Subpoena response."  (*Id.* at 2.)  The report further identifies various "instances where email PST files had been moved to the Recycle Bin," with one such move occurring in May 2019 and another in February 2020. (*Id.* at 13.)  Finally, the report concludes that Plaintiff made false representations during a December 2020 conversation related to the forensic review, by claiming that "he stopped using the invst4u@cox.net email account in 2017," because other pieces of evidence established that Plaintiff "was using the invst4u@cox.net email address" until at least February 2, 2020 and possibly as late as August 26, 2020.  (*Id.* at 14.)

▪ External Storage Devices:  The report explains that "[d]uring the forensic examination of the two laptops that [Plaintiff] provided . . . , a number of USB drive[s] were identified that had not been provided for examination."  (*Id.* at 2.)  Plaintiff

---

[2]      The report explains that Bleachbit "is advertised as a privacy solution that erases many tracks left by a user on his computer and has features specifically designed to thwart forensic examinations.  Bleachbit has a file/folder shredding capability, as well as the ability to wipe the entire unused space of a hard drive, thereby removing all previously deleted data.  BleachBit has a particularly troubling anti forensics feature that allows a user, when running Bleach Bit, to have the program erase any indications that it was ever run . . . ."  (Doc. 73-1 at 15-16.)

subsequently provided two USB drives on March 16, 2021.  (*Id.*)  The ensuing forensic review of these USB drives revealed that the "unused space . . . where previously deleted data/files would normally reside (and generally be available for forensic examination) was wiped using software designed to destroy data."  (*Id.* at 2-3.)  Both devices were wiped on March 15, 2021—that is, the day before Plaintiff produced them for examination.  (*Id.*)

▪ Text Messages:  The report concludes that Plaintiff "failed to preserve any of his text messages from prior to [October 30, 2020].  This was due to either intentional deletion or a lack of confirmation by [Plaintiff] that his messages were being completely transferred from one device to the next. . . .  [Plaintiff also] failed to provide the correct password to open an ITunes backup of his iPhone 11 created on [October 30, 2018].  This backup would likely contain historical text messages from prior to [October 30, 2020]."  (*Id.* at 2.)

Defendants proffer the factual findings in the expert's report, which they describe as "unchallenged," in support of their sanctions motion.  (Doc. 84 at 1, 2, 7-9.)  Plaintiff, in turn, does not address (let alone dispute) most of the facts set forth above.  To the contrary, and as discussed in more detail below, Plaintiff seems to acknowledge that he engaged in the conduct described in the expert's report and simply argues that his conduct was not sanctionable because the devices at issue did not contain ESI that was potentially relevant to this litigation.  (*See, e.g.*, Doc. 89 at 4 ["[Plaintiff] was not under any prohibition from deleting, moving, or renaming his own personal or professional information, and he had no obligation to produce equipment that was not involved in housing or creating potentially relevant ESI."]; *id.* at 7 ["Because he neither created nor stored any potentially relevant ESI on his phones, there was no requirement to preserve their storage functions."]; *id.* at 8 ["The Use of Data Reduction Methods Are [sic] Neither Prohibited Nor Nefarious."]; *id.* at 10 ["The bulk of Plaintiff's alleged ESI preservation violations argued in the motion are diversionary . . . ."].)

Given this backdrop, the Court adopts the undisputed facts in the expert's report and makes the following factual findings: (1) Plaintiff performed factory resets of six personal iPhones between December 2016 and February 2021, including several resets after the

commencement of this litigation in September 2018; (2) Plaintiff used iShredder on one of his iPhones as early as August 2018 and as late as December 2020; (3) Plaintiff performed factory resets on both of the laptops he provided for imaging in this matter, with the resets likely occurring in September and October 2020; (4) Plaintiff ran Bleachbit and iShredder on the older laptop in August 2018; (5) Plaintiff ran an anti-forensics feature of Bleachbit called "chaff," whereby Bleachbit creates a user defined amount of gibberish files designed to fill space on the hard drive and overwrite existing data, on the older laptop in March 2020; (6) Plaintiff again ran iShredder on the older laptop in December 2020; (7) Plaintiff attempted to deceive the forensic examiners by passing off a laptop he did not purchase until September 2020 (and which was not commercially available until June 2020) as the newer of the two laptops that was discussed during his March 2020 deposition; (8) Plaintiff purged the content of his invst4u@cox.net email account on several occasions after the initiation of this lawsuit; (9) Plaintiff moved files from the invst4u@cox.net email account into his recycle bin in May 2019 and again in February 2020; (10) Plaintiff made false representations during a December 2020 conversation related to the forensic examination, by claiming that he stopped using the invst4u@cox.net email account in 2017, because he was actually using that email address until at least February 2020 and possibly as late as August 2020; (11) Plaintiff used "wiping" software on the two USB drives he provided for forensic examination on March 16, 2021, including wiping both devices on March 15, 2021, the day before the production; (12) Plaintiff failed to preserve any of his text messages from before October 30, 2020; and (13) Plaintiff failed to provide the correct password to open an iTunes backup of his iPhone 11 created on October 30, 2018.

In the following sections of this order, the Court addresses the additional facts bearing on whether this undisputed conduct may (and should) give rise to sanctions.

## B.    **The Parties' Arguments**

Defendants seek the imposition of terminating sanctions against Plaintiff pursuant to Rules 37(b)(2) and 37(e)(2) of the Federal Rules of Civil Procedure.  (Doc. 84 at 1, 11-17.)  Defendants characterize Plaintiff's conduct as the "mass destruction of electronically

stored information" and argue that the presence of bad faith can be inferred from Plaintiff's efforts to continue destroying ESI even after he was admonished by his own counsel not to destroy evidence (*id.* at 1-2) and after a forensic expert was appointed to investigative his conduct (*id.* at 2-3, 7-9); from Plaintiff's use of commercial programs specifically designed to hide evidence (*id.* at 2, 4-6); from Plaintiff's admission, during his deposition, that one of the reasons he destroyed the ESI was to prevent Defendants from obtaining his "client data," which was specifically designated as a potentially relevant subject area in a court order (*id.* at 9-10); and from Plaintiff's repeated lies under oath when questioned about his spoliation of evidence (*id.* at 10-11).  Defendants also note that, although Plaintiff testified during his deposition that he engaged in the challenged conduct in an effort to hide embarrassing, but irrelevant, information concerning pornography viewing and extramarital affairs, those excuses ring hollow because information concerning those topics would not have appeared on Plaintiff's laptops and flash drives.  (*Id.* at 10.)  Defendants conclude by identifying an array of cases in which terminating sanctions were imposed under Rules 37(b)(2) and 37(e)(2) for similar conduct.  (*Id.* at 11-17.)

In his response, Plaintiff does not seriously dispute that he deleted ESI from his cell phones, laptops, and USB devices, purged his email account, and failed to preserve his text messages.  Instead, Plaintiff's essential argument is that sanctions are unwarranted because none of the deleted ESI was potentially relevant to this litigation and none of his actions were taken in bad faith.  According to Plaintiff, "ninety-five percent of the volume of documents involved in this case were created in 2011-2012 and exchanged by both parties at the time of the 2014 [FINRA] arbitration."  (Doc. 89 at 1-2.)  In a related vein, Plaintiff argues that the FINRA arbitration proceeding, OSHA proceeding, and other related proceedings generated a huge volume of discovery materials, that Defendants expressed satisfaction with Plaintiff's disclosure efforts during those proceedings, and that Defendants only "[s]uddenly" began raising concerns about discovery issues after they failed to prevail in the OSHA proceeding.  (*Id.* at 2-4.)  Next, Plaintiff offers a series of arguments in somewhat scattershot fashion.  First, Plaintiff disputes the relevance of certain

deleted documents that were recovered during the forensic review, arguing that because most of the documents were "dated post-termination," they have "tangential, if not questionable, relevance on their face to this Sarbanes-Oxley claim." (*Id.* at 4-6.) Next, Plaintiff contends that his good faith can be inferred from the fact that he voluntarily agreed to the forensic examination of his devices, even though "his counsel advis[ed] he had a good chance of defeating a compelled motion [for] forensic examination." (*Id.* at 6-7.) Next, Plaintiff emphasizes that the stipulated protected order did not require him to "provide every piece of equipment he had," and instead only compelled him "to produce media that contained or previously contained 'potentially relevant ESI,'" and suggests that his phones did not contain any such material. (*Id.* at 7.) Plaintiff also takes issue with the forensic expert's failure to define certain terms in the report, such as the terms "unallocated space" and "factory reset" (*Id.* at 7-8.) As for the use of BleachBit and iShredder, Plaintiff characterizes them as "common space spacing and performance enhancing apps" and criticizes the expert for "attempt[ing] to paint" his use of such apps as "nefarious." (*Id.* at 8-9.) Next, as for whether the deleted ESI was potentially relevant to this litigation, Plaintiff argues that neither the expert nor Defendants have "identified (a) any type of employment documents, (b) category of protected activity, adverse action, causation or employer knowledge or damages, or (c) post-arbitration date range of documents expected to exist and be produced that have not been." (*Id.* at 9.) Next, Plaintiff denies that his attorneys took steps "to protect themselves" from the accusations of spoliation in this case and criticizes the expert's lack of responsiveness to Plaintiff's criticisms of the initial draft of the report. (*Id.*) Next, Plaintiff argues that Defendants' spoliation allegations related to his "Private iPhones and Email" are "Diversionary" because he didn't use those devices to transact business while employed by Defendants. (*Id.* at 10.) In a related vein, Plaintiff disputes Defendants' contention that recordings of relevant conversations were stored on his phones. (*Id.* at 11.) Plaintiff concludes by arguing that the cases cited in Defendants' motion are distinguishable and that "[t]here is no precedent for an ESI dismissal sanction as Defendants demand in this case." (*Id.* at 11-13.)

In reply, Defendants argue that Plaintiff's response "does not attempt to deny—or address—the fact that, in violation of the Court's Order setting the forensic exam, he intentionally used anti-forensic software to destroy data, wiped multiple devices, failed to turn in others, failed to retain any text messages predating the Court's Order, discarded a requested laptop and produced a new one in its place, and sold his iPhone on eBay and then tried to pass off a new phone in its place." (Doc. 99 at 1.)  Defendants also contend that although Plaintiff attempts to "replace[] his prior excuses for spoliation—*i.e.,* destroying evidence of his extramarital affair, pornography, and client data—with new excuses, such as he was trying to 'save space,' . . . his new excuses make no sense and do not relieve him of his duty to preserve and produce potentially relevant ESI." (*Id.*)  As for Plaintiff's assertions about the volume of discovery materials produced during the earlier proceedings, Defendants contend that "[t]he totality of documents the parties collectively exchanged (the vast majority of which were Defendants' productions to [Plaintiff]) is beside the point" because "the issue here is whether Burris failed to comply with this Court's orders to preserve and produce his potentially relevant ESI from his electronic media in this lawsuit, as the Court's October 29, 2020 Order, the MIDP, and the Civil Rules all required him to do." (*Id.* at 3, emphases omitted.)  As for Plaintiff's argument that the handful of documents recovered during the forensic review were irrelevant, Defendants respond that (1) the documents are relevant, and (2) their relevance is a *non sequitur* because the other documents that Plaintiff successfully destroyed were relevant. (*Id.* at 3-4.)  As for Plaintiff's claim of reliance on counsel, Defendants argue this claim is both unsupported by the record and irrelevant. (*Id.* at 4.)  As for Plaintiff's "space saving" explanation, Defendants argue it lacks merit because (1) Plaintiff offers no evidence that his devices were running low on storage, (2) Plaintiff used the "chaff" feature of BleachBit to fill the unused space on his laptops with gibberish, which is the opposite of saving space; and (3) a party with preservation obligations is not, in any event, allowed to shirk those obligations due to space-saving concerns. (*Id.* at 5.)  Finally, as for Plaintiff's claim that the destroyed ESI was irrelevant, Defendants respond as follows:

1

2      [A]ccepting [Plaintiff's] position that the documents he destroyed. . . were
       not relevant would require the Court to turn a blind eye to the claims and
3      defenses at issue in this case. [Plaintiff] was terminated for violating multiple
       [of Defendants'] policies and FINRA Rules designed to protect customers,
4      including but not limited to concealing a customer complaint from JPMorgan
       and attempting to resolve the complaint using fake company letterhead as
5      well as mismarking as "unsolicited" trades that he suggested to customers.
       After his termination, Burris continues to service some of the same clients
6      that he serviced while [employed by Defendants]. [Plaintiff] seeks damages
7      in this lawsuit through 2033 on allegations that Defendants "caused future
       clients . . . not to retain his services" by publicly reporting just some of the
8      customer issues that led to his termination. [Plaintiff] identified without
       limitation his "correspondence with clients" in his MIDP responses. Before
9      the forensic exam, he selectively produced customer statements and
       complaints that he solicited after his termination (including after the 2014
10     FINRA arbitration) in an effort to bolster his claims and to undermine
11     Defendants' reasons for terminating him in later proceedings. It defies
       credulity for [Plaintiff] to pretend now that "client data" is not at issue in this
12     case, and that his choice to systematically purge his devices of everything
13     but that which he alone deemed "relevant" did not prejudice Defendants.
14

15     (*Id.* at 8-9.) Put another way, Defendants argue that Plaintiff "claims that post-2012

16     documents are irrelevant, but he alleges retaliation after 2012 and damages through 2033.

17     He cannot have it both ways." (*Id.* at 9.)

18           C.    **Legal Standard**

19           As noted, Defendants seek the imposition of terminating sanctions under both Rule

20     37(b)(2) and Rule 37(e)(2). The Court will address Rule 37(e)(2) because it specifically

21     contemplates the imposition of sanctions based on the loss of ESI.[3]

22           Rule 37(e) was "completely rewritten" in 2015 to "provide[] a nationally uniform

23     standard for when courts can give an adverse inference instruction, or impose equally or

24     more severe sanctions, to remedy the loss of ESI." 1 Gensler, Federal Rules of Civil

25     Procedure, Rules and Commentary, Rule 37, at 1194 (2021). The text of Rule 37(e)(2)

26

27     _____

       [3]    Because, as discussed below, the Court ultimately concludes that terminating
       sanctions are warranted under Rule 37(e)(2), this order does not separately address the
28     standards and elements applicable under Rule 37(b)(2). The Court clarifies, however, that
       it also would have imposed terminating sanctions under that provision.

now provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> . . .
>
> (2)   only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
> > (A)   presume that the lost information was unfavorable to the party;
> >
> > (B)   instruct the jury that it may or must presume the information was unfavorable to the party; or
> >
> > (C)   dismiss the action or enter a default judgment.

A party seeking sanctions under Rule 37(e) has a threshold duty to show that the ESI at issue was, in fact, lost or destroyed. Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment ("The new rule applies only . . . when [ESI] is lost."). If such a showing has been made, the court must then determine whether "(1) the ESI should have been preserved in the anticipation or conduct of litigation; (2) the ESI is lost because a party failed to take reasonable steps to preserve it; and (3) the ESI cannot be restored or replaced through additional discovery." *Porter v. City & Cnty. of San Francisco*, 2018 WL 4215602, *3 (N.D. Cal. 2018) (cleaned up). *See also* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment ("The new rule applies only if the lost information should have been preserved in the anticipation or conduct of litigation and the party failed to take reasonable steps to preserve it.").

If each of these questions is answered in the affirmative, the next inquiry under Rule 37(e)(2) is whether the nonmovant "acted with the intent to deprive another party of the information's use in the litigation." *Porter*, 2018 WL 4215602 at *3. Unlike Rule 37(e)(1), Rule 37(e)(2) "does not include a requirement that the court find prejudice to the party

deprived of the information.  This is because the finding of intent required by the subdivision can support not only an inference that the lost information was unfavorable to the party that intentionally destroyed it, but also an inference that the opposing party was prejudiced by the loss of information that would have favored its position.  Subdivision (e)(2) does not require any further finding of prejudice."  Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.

If such intent is found, the Court has discretion to impose any of the sanctions authorized in subsections (e)(2)(A)-(C) (*i.e.*, an adverse inference, an adverse-inference jury instruction, or a terminating sanction).  However, "[f]inding an intent to deprive another party of the lost information's use in the litigation does not require a court to adopt any of the measures listed in subdivision (e)(2).  The remedy should fit the wrong, and the severe measures authorized by this subdivision should not be used when the information lost was relatively unimportant or lesser measures such as those specified in subdivision (e)(1) would be sufficient to redress the loss."  *Id.*

"[T]he applicable standard of proof for spoliation in the Ninth Circuit appears to be by a preponderance of the evidence."  *Compass Bank v. Morris Cerullo World Evangelism*, 104 F. Supp. 3d 1040, 1052-53 (S.D. Cal. 2015).  *See also Singleton v. Kernan*, 2018 WL 5761688, *2 (S.D. Cal. 2018) ("A party seeking sanctions for spoliation of evidence has the burden of establishing [spoliation of nonelectronic records] by a preponderance of the evidence[.]").  The Court is the appropriate finder of fact on a Rule 37(e) motion.  *Mannion v. Ameri-Can Freight Sys. Inc.*, 2020 WL 417492, *4 (D. Ariz. 2020).  *See also Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1408 (9th Cir. 1990) ("The imposition of discovery sanctions pursuant to [Rule 37] is reviewed for abuse of discretion.  Absent a definite and firm conviction that the district court made a clear error in judgment, this court will not overturn a Rule 37 sanction.  Findings of fact related to a motion for discovery sanctions are reviewed under the clearly erroneous standard.  If the district court fails to make factual findings, the decision on a motion for sanctions is reviewed de novo.") (citations omitted).

…

D.   **Analysis**

1.   Whether ESI Was Lost

A party seeking sanctions under Rule 37(e) has a threshold duty to show that the ESI at issue was, in fact, lost or destroyed.  Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment ("The new rule applies only . . . when [ESI] is lost.").

Here, large volumes of ESI were lost.  The Court has found (and Plaintiff does not dispute) that Plaintiff deleted the ESI from six cell phones, two laptops, and two USB devices, purged his email account, and failed to preserve his text messages.  Although Plaintiff disputes whether the deleted ESI was potentially relevant—an issue that is addressed in Part II.D.2.b below—everybody agrees that it is gone.[4]

2.   Duty to Preserve

Sanctions are available under Rule 37(e) only if the loss of ESI occurred at a time when litigation was pending or reasonably foreseeable.  Fed. R. Civ. P. Rule 37(e), advisory committee's note to 2015 amendment ("The new rule applies only if the lost information should have been preserved in the anticipation or conduct of litigation . . . Many court decisions hold that potential litigants have a duty to preserve relevant information when litigation is reasonably foreseeable.  Rule 37(e) is based on this common-law duty; it does not attempt to create a new duty to preserve.  The rule does not apply when information is lost before a duty to preserve arises.").  Further, the ESI must have been foreseeably relevant to the pending or foreseeable litigation.  *Id.* ("Courts should consider the extent to which a party was on notice that litigation was likely *and that the information would be relevant.*") (emphasis added).

a.   **Reasonable Foreseeability Of Litigation**

As the Ninth Circuit has explained, parties "engage in spoliation of documents as a matter of law only if they had 'some notice that the documents were potentially relevant'

---

[4]      As discussed in Part I above, Plaintiff attempted to submit evidence (in the form of Table 1) to establish that some of the files found in his recycle bin could be found elsewhere.  Table 1 is not properly before the Court, but even if it were, it would not change the analysis—even accepting Plaintiff's characterization of the ESI described in Table 1, there are still huge volumes of missing ESI.

to the litigation before they were destroyed." *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002). "This is an objective standard, asking not whether the party in fact reasonably foresaw litigation, but whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation." *Waymo LLC v. Uber Techs., Inc.*, 2018 WL 646701, *14 (N.D. Cal. 2018) (internal quotation marks omitted). The reasonable foreseeability of litigation "is a flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry. This standard does not trigger the duty to preserve documents from the mere existence of a potential claim or the distant possibility of litigation. However, it is not so inflexible as to require that litigation be 'imminent, or probable without significant contingencies.'" *Id.* at *15 (quoting *Micron Tech., Inc. v. Rambus, Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011)).

It is sometimes difficult to determine whether litigation was reasonably foreseeable at the time of the challenged acts of ESI destruction. This is not such a case. Although Defendants argue that Plaintiff's "duty to preserve evidence triggered no later than Nov. 6, 2012," which is the date on which Plaintiff was terminated (Doc. 84 at 14), the sanctions analysis in this case ultimately does not turn on whether Plaintiff's preservation obligations arose pre-litigation. At a minimum, Plaintiff had a duty to preserve relevant documents once he initiated this action in September 2018. (Doc. 1.) And as discussed in Part II.A above, many of the challenged acts of spoliation occurred after that date—after the initiation of litigation, Plaintiff performed factory resets on several of his phones and both of his laptops; used iShredder on one of his phones; ran an anti-forensics feature of Bleachbit called "chaff" on one of his laptops; ran iShredder on one of his laptops; repeatedly purged the content of his invst4u@cox.net email account; repeatedly moved files from the invst4u@cox.net email account into his recycle bin; used "wiping" software on the two USB drives he provided for forensic examination; and failed to preserve any of his text messages from before October 30, 2020. Indeed, Plaintiff engaged in much of this undisputed conduct after the entry of the revised protective order on October 29, 2020

- 22 -

(Doc. 61), which gave express notice to Plaintiff that he could face sanctions based on the deletion of ESI.

### b. Reasonable Foreseeability Of The Relevance Of Lost ESI

"A party's destruction of evidence qualifies as willful spoliation if the party has some notice that the documents were *potentially* relevant to the litigation before they were destroyed." *Leon v. IDX Sys. Corp.*, 464 F.3d 951 (9th Cir. 2006). "Moreover, because the relevance of . . . destroyed documents cannot be clearly ascertained because the documents no longer exist, a party can hardly assert any presumption of irrelevance as to the destroyed documents." *Id.* (cleaned up).

As noted, Plaintiff's primary argument is that the deleted ESI was irrelevant to the claims and defenses in this litigation, which involves a whistleblower claim arising from Plaintiff's termination in November 2012, because it was generated after the date of his termination (and/or after the conclusion of the FINRA arbitration in 2014).

This argument is easily rejected. In section 1.2 of the Second Addendum to the stipulated protective order, the parties jointly defined the term "Potentially Relevant ESI" as follows:

> "Potentially Relevant ESI" means ESI within the scope of permissible discovery as provided within Federal Rule of Civil Procedure 26 and 34, such as ESI that concerns, substantiates, refers or relates to: Plaintiff's claims or allegations against Defendants or any of Defendants' current or former employees, whether asserted in this matter or in any other legal, administrative, or investigatory proceeding; Defendants' defenses to any of those claims; Plaintiff's employment with or separation from Defendants; customers that Plaintiff serviced while he was still employed with Defendants; Plaintiff's efforts to find other employment after his employment with Defendants ended or otherwise mitigate his purported damages; Plaintiff's tax returns and other statements of income for himself individually and for Burris Wealth Management; J.P. Morgan Private Bank Managed Accounts, Chase Strategic Portfolio Managed Accounts, and any other "proprietary mutual funds" and "bank managed products" offered by Defendants; and/or communications or documents regarding Defendants or any of Defendants' current or former employees exchanged between Plaintiff and any third-party, including with any government or regulatory agency or

1
2
3

personnel, current or former employees of Defendants, current or former customers of Defendants, or news journalists and other members of the press or media.

4

(Doc. 61 at 2-3.)  As this definition makes clear, there was no temporal cutoff on the scope

5

of "potentially relevant ESI."  Indeed, because one of the categories of damages sought by

6

Plaintiff in this action is "[e]conomic damages for injury to Plaintiff's career, professional

7

reputation and earning capacity" (Doc. 1 at 21), the definition of "potentially relevant ESI"

8

included "ESI that concerns, substantiates, refers or relates to . . . Plaintiff's efforts to find

9

other employment after his employment with Defendants ended or otherwise mitigate his

10

purported damages."  Such ESI would necessarily post-date Plaintiff's separation from

11

Defendants in November 2012.

12

Notably, Plaintiff admitted that some of the ESI he destroyed fell within this

13

category.  During a deposition in March 2020, Plaintiff stated that he "wiped" his laptop

14

because "I had client data in it, so I don't want that data to get into anybody's hands."

15

(Doc. 78-2 at 23.)  Similarly, during another deposition in June 2021, Plaintiff stated that

16

he performed factory resets on each of his iPhones because "I am not going to give a device,

17

sell a device, transfer a device, whatever to anybody that has my client data in it.  I'm just

18

not doing it."  (Doc. 78-3 at 21.)  These admissions are damning because "client data," in

19

context, refers to the clients that Plaintiff serviced after leaving Defendants' employment.

20

Information regarding such clients (and the income that Plaintiff earned from them) was

21

directly relevant to Plaintiff's claim for prospective economic damages, as recognized in

22

the parties' joint definition of "potentially relevant ESI."

23

To the extent the "clients" at issue were former clients of Defendants whom Plaintiff

24

took with him after he stopped working for Defendants, Plaintiff's communications with

25

such clients would also fall within the parties' joint definition of "potentially relevant ESI"

26

because they were "communications or documents regarding . . . current or former

27

customers of Defendants."  For these reasons, the Court has no trouble concluding that

28

Plaintiff had notice that the ESI he was destroying was potentially relevant to the litigation.

In reaching this conclusion, the Court notes that Defendants discussed the destruction of "client data" at length in their motion and specifically argued that Plaintiff's "assertion that he wished to destroy 'client data' was a direct admission that he violated the Order." (Doc. 84 at 3, 6, 9-10, 15.) In response, Plaintiff argued in conclusory fashion—in a section of his brief unadorned by any citations to the record—that he "was not prohibited from any reasonable activity or data management that avoided providing non-JPMC client records." (Doc. 89 at 7.) But as discussed above, Plaintiff *was* prohibited from deleting such information.

Another category of information falling within the parties' joint definition of "potentially relevant ESI" was "communications or documents regarding . . . any of Defendants' current or former employees exchanged between Plaintiff and any third-party, including with any . . . current or former employees of Defendants." Put another way, all communications between Plaintiff and current or former employees of Defendants were deemed potentially relevant, regardless of when they were sent. With this understanding in mind, the Court easily concludes that Plaintiff had notice that he was destroying potentially relevant ESI by purging the contents of his invst4u@cox.net email account. Although Plaintiff falsely testified during his deposition that he never used that account to communicate with current or former employees of Defendants about the subject matter of this litigation,[5] Defendants have submitted undisputed evidence that Plaintiff did, in fact, use the invst4u@cox.net email account for that purpose. (Doc. 78-35 [October 2016 email, entitled "JP Morgan" and sent by Plaintiff from his invst4u@cox.net account to one of Defendants' employees, setting forth a series of questions about Plaintiff's termination and Plaintiff's whistleblowing theory].)[6]

Because the Court has now identified several categories of destroyed ESI that were

---

[5] Doc. 78-3 at 57 (Q: "Now, after you left JPMorgan, did you use any of your personal e-mail accounts to communicate with . . . any JPMorgan employees or former employees regarding the subject matter of this litigation?" A: "No.").

[6] Although the email itself doesn't specify whether the recipient is one of Defendants' current or former employees, Defendants have submitted a declaration avowing that the recipient was Plaintiff's "former boss's assistant." (Doc. 78-4 ¶ 84.)

potentially relevant in this litigation, it is unnecessary to resolve all of Defendants'
additional theories as to why the destroyed ESI should be deemed potentially relevant.  The
Court notes, however, that it is highly skeptical of Plaintiff's contention that the remaining
destroyed ESI was irrelevant.  When Plaintiff was initially asked to explain why he'd
engaged in such extensive evidence-destruction efforts, he stated that he was simply
attempting to eliminate embarrassing, but irrelevant, personal information. (Doc. 85 at 7-
8.)  But as Defendants establish in their motion (and as Plaintiff fails to rebut in his
response), that embarrassing information would not have appeared on all of the devices
Plaintiff wiped.  After that excuse fell flat, Plaintiff suggested in his response that one of
the reasons he used BleachBit and iShredder was "space saving and performance
enhancing."  (Doc. 89 at 8.)  But this rationale is almost laughable—Plaintiff's use of
BleachBit's "chaff" feature on his laptop was intended to *fill* the device with useless
gibberish, not save space.  Finally, and as discussed in more detail in Part II.D.5 below,
Plaintiff was caught red-handed in a series of other lies and acts of deception during the
forensic examination process, including lying about when he stopped using his personal
email account and attempting to pass off a recently purchased laptop as a different laptop.
This backdrop raises a strong inference that the ESI destroyed by Plaintiff was not
irrelevant, personal information but information that was devastating to (and, at a
minimum, potentially relevant to) his claims in this action.  *Cf. Klipsch Grp., Inc. v. ePRO
E-Com., Ltd.*, 880 F.3d 620, 628 (2d Cir. 2018) (concluding that "the district court
[properly] inferred relevance and prejudice only from the unrecoverable data, and viewed
the various means of deleting data as cumulative proof that ePRO's spoliation was
willful").

3.　　Reasonable Steps To Preserve

The Court must next determine whether "the ESI is lost because a party failed to
take reasonable steps to preserve it . . . ."  *Porter*, 2018 WL 4215602 at *3 (cleaned up).

The analysis as to this factor is straightforward.  This isn't a case where ESI was
lost due to reasons outside Plaintiff's control.  *See* Fed. R. Civ. P. 37(e), advisory

- 26 -

committee note to 2015 amendment ("[T]he rule . . . is inapplicable when the loss of information occurs despite the party's reasonable steps to preserve.  For example, . . . information the party has preserved may be destroyed by events outside the party's control—the computer room may be flooded, a 'cloud' service may fail, a malign software attack may disrupt a storage system, and so on.").  Quite the opposite—Plaintiff engaged in an intentional, lengthy, and multifaceted scheme to destroy ESI, including performing factory resets on multiple phones and laptops, purging his email account, dragging his email into his recycle bin, installing and repeatedly using BleachBit and iShredder, and wiping his USB drives the day before he handed them over for inspection.

### 4.   Replaceability

The next question under Rule 37(e) is whether the lost discovery "can be restored or replaced through additional discovery."

The expert report concludes that Plaintiff "caused Potentially Relevant ESI to be irrevocably lost from his Electronic Media" (Doc. 73-1 at 2) and Plaintiff does not seriously dispute this point (apart from his effort to submit Table 1, which as discussed elsewhere is not properly before the Court and would not, in any event, establish that all of the deleted ESI is replaceable).  To recap, Plaintiff permanently deleted ESI from an array of phones, laptops, and USB devices and also purged the contents of his email account.  A court-appointed expert concluded, after extensive analysis, that this ESI is irretrievably lost.  Accordingly, the Court is satisfied that the missing ESI is not replaceable through additional discovery.

### 5.   Intent To Deprive

The next inquiry under Rule 37(e)(2) is whether the nonmovant "acted with the intent to deprive another party of the information's use in the litigation."  *Porter*, 2018 WL 4215602 at *3.

The Court will not belabor the analysis as to this factor—the sheer number of obfuscatory actions undertaken by Plaintiff, which are described in extensive detail in other sections of this order, evince an unusually clear level of intent to deprive Defendants of

potentially relevant ESI.

The temporal proximity between Plaintiff's acts and key discovery events provides further circumstantial evidence of intent. *Colonies Partners, L.P. v. Cnty. of San Bernardino*, 2020 WL 1496444, *9 (C.D. Cal. 2020) ("Courts . . . consider the timing of the document loss when evaluating intent."). Among other things, Plaintiff used Bleachbit's "chaff" feature only three days after the parties stipulated to a court order permitting third-party subpoenas and then "wiped" both USB drives *the day before* handing them over for forensic examination.

Finally, perhaps the most compelling evidence of intent arises from Plaintiff's lies and acts of deception during the forensic examination process. During a deposition in March 2020, Plaintiff testified that he had two Dell laptops: (1) a laptop that he currently used, which was located in his home office; and (2) an older Dell laptop that the newer one "replaced." (Doc. 78-2 at 21-23.) Meanwhile, under the second addendum to the protective order, Plaintiff was required, upon request, to "promptly make [his] Electronic Media available to the expert." (Doc. 61 at 4.) Included in the definition of "Electronic Media" were "computers [and] laptops." (*Id.* at 2.) Accordingly, during the forensic examination process, Plaintiff provided two Dell laptops for examination. (Doc. 73-1 at 3, 14-15.) However, this examination revealed that the newer of the two laptops provided by Plaintiff was "a Dell laptop model number P91f, which was [commercially] released in June 2020." (*Id.* at 15.) Additionally, Dell's shipping records showed that this laptop was not shipped to Plaintiff until September 2020. (*Id.*) Based on these obvious date discrepancies, the report concludes that "it is impossible that . . . the Dell 91f . . . was one of the two laptops [Plaintiff] testified he had used at the time of his March 12, 2020 deposition." (*Id.*)

To put it in layman's terms, Plaintiff attempted to pass off a Dell laptop he purchased in September 2020 as the laptop he described during his March 2020 deposition as the main computer in his home office. Such outrageous conduct is utterly inconsistent with good faith. Tellingly, although Defendants repeatedly refer to this episode in their motion (Doc.

84 at 7 & n.7, 8, 13, 15), Plaintiff makes no effort to address it (let alone defend it) in his response.

Plaintiff also engaged in deception in relation to his email account. The expert report states that, during a conference on December 15, 2020, Plaintiff "stated that he stopped using the invst4u@cox.net email account in 2017." (Doc. 73-1 at 14.)[7] However, the report concludes that "[b]ased on the subscriber records provided by Apple, it appears that [Plaintiff] was using the invst4u@cox.net email address until" at least February 2020 and that "a review of the content of [a different account] revealed emails sent by Plaintiff using the invst4u@cox.net account as late as" August 2020. (*Id.*) Such duplicity is, again, inconsistent with good faith but consistent with an intent to deprive.

6.   Dismissal Sanction

"[P]reclusive sanctions, such as dismissal of a case or entry of judgment against a party, are disfavored." *Ritchie v. United States*, 451 F.3d 1019, 1026 (9th Cir. 2006). Thus, "[b]efore imposing the harsh sanction of dismissal, . . . the district court should consider the following factors: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions. While the district court need not make explicit findings regarding each of these factors, a finding of willfulness, fault, or bad faith is required for dismissal to be proper. Additionally, the district court must consider less severe alternatives than outright dismissal." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (citations and internal quotation marks omitted). *See also* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment ("[T]he severe measures authorized

---

[7]    Defendants' motion and the declaration accompanying Defendants' motion both state that the transcript of the December 15, 2020 conference is attached as Exhibit 14 to the motion. (Doc. 84 at 1-2, 8; Doc. 78-4 ¶¶ 42-43.) This is inaccurate. Exhibit 14 (Doc. 78-18) consists of a string of emails. Although some of the emails refer to the December 15, 2020 conference, no transcript of that conference is provided. Nevertheless, despite the seemingly missing transcript, the record is sufficient to make factual findings on this issue. Defendants proffered the expert's report (which describes Plaintiff's statement) in support of their motion and Plaintiff did not, in his response, address (much less dispute) the report's description of his statement during the December 15, 2020 conference.

by [Rule 37(e)(2)] should not be used when the information lost was relatively unimportant or lesser measures such as those specified in subdivision (e)(1) would be sufficient to redress the loss.").

Having given careful consideration to the aforementioned standards, and recognizing that dismissal is a disfavored sanction that should be imposed sparingly, the Court still concludes that dismissal is warranted here.

When a court order has been violated, "factors 1 and 2 support sanctions and 4 cuts against case-dispositive sanctions, so 3 and 5, prejudice and availability of less drastic sanctions, are decisive." *Valley Engineers Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051, 1057 (9th Cir. 1998). Here, Plaintiff violated at least the Court's October 29, 2020 order, which required Plaintiff to preserve and produce ESI for forensic review.

"[F]actor 5 involves consideration of three subparts: whether the court explicitly discussed alternative sanctions, whether it tried them, and whether it warned the recalcitrant party about the possibility of dismissal. . . .  But despite all this elaboration of factors . . . it is not always necessary for the court to impose less serious sanctions first, or to give any explicit warning." *Id.* (citation omitted).

The Court will begin with the third prong of factor 5—whether it warned the recalcitrant party about the possibility of dismissal.  Rule 37 of the Federal Rules of Civil Procedure warns that dismissal is an appropriate sanction for failure to comply with court order, Rule 37(b)(2)(v), or for failure to preserve ESI, Rule 37(e)(2)(c).  Additionally, the Court's October 2020 order explicitly warned Plaintiff that "Defendants may seek . . . appropriate sanctions up to and including default . . . if Plaintiff: unreasonably fails to identify or provides misleading information concerning his Electronic Media and Potentially Relevant ESI; obstructs, attempts to evade, or unduly delays the . . . efforts as provided herein; deleted or failed to preserve Potentially Relevant ESI while under a duty to preserve it; or engaged in any other discovery misconduct."  (Doc. 61 at 8.)  The Court finds that it gave adequate warnings about the possibility of dismissal.

The first and second prongs of factor 5, which analyze alternative sanctions, seem

to dovetail with factor 3, which addresses the risk of prejudice to Plaintiff if his case is dismissed.  The Court will discuss those issues collectively.

"What is most critical for case-dispositive sanctions, regarding risk of prejudice and of less drastic sanctions, is whether the discovery violations threaten to interfere with the rightful decision of the case. . . .  Dismissal is appropriate where a pattern of deception and discovery abuse made it impossible for the district court to conduct a trial with any reasonable assurance that the truth would be available. . . .  Sometimes . . . a party's discovery violations make it impossible for a court to be confident that the parties will ever have access to the true facts."  *Valley Engineers,* 158 F.3d at 1057-58 (citation and quotation marks omitted).

Plaintiff does not propose any sanctions in lieu of dismissal, instead arguing that "there is no basis to impose any sanction whatsoever" (Doc. 89 at 1), but the Court would decline to impose lesser sanctions even if Plaintiff had proposed them.  An adverse jury instruction or presumption that covers all of the destroyed evidence would have to be so broad that it would, itself, essentially terminate the case.  Additionally, the sheer scope of Plaintiff's dishonesty and spoliation efforts—which the Court explicitly finds amounted to bad faith—makes this the rare case where it is impossible to have confidence that Defendants will ever have access to the true facts.  Thus, the Court finds that although it did not impose alternative sanctions before dismissal, such sanctions are "not necessary" in this case.  *Valley Engineers*, 158 F.3d at 1057.

Of course, dismissal will be highly prejudicial to Plaintiff.  But Plaintiff already had the opportunity to litigate several of his termination-related claims on the merits, via a two-week FINRA arbitration.  This somewhat reduces the prejudice of dismissal.  At any rate, because Plaintiff has engaged in such extensive misconduct and deception, without any obvious contrition or awareness of the wrongfulness of his conduct, there is a serious risk that further proceedings will continue to be plagued by a "pattern of deception and discovery abuse [which makes it] impossible for the district court to conduct a trial with any reasonable assurance that the truth would be available."  *Id.* at 1058.

Accordingly,

**IT IS ORDERED** that Plaintiff's motion to file omitted exhibits in opposition to Defendants' motion for sanctions (Doc. 92) is **denied**.

**IT IS FURTHER ORDERED** that Defendants' motion for sanctions (Docs. 78, 84) is **granted**.

**IT IS FURTHER ORDERED** that Plaintiff's complaint (Doc. 1) is **dismissed with prejudice**.  The Clerk of Court shall terminate this action and enter judgment accordingly.

Dated this 7th day of October, 2021.

Dominic W. Lanza
United States District Judge